At this time, would counsel for the appellants please introduce themselves on the record to begin. Good morning, Your Honor. As may it please the Court, Jonathan Bolton, Assistant Attorney General, and I represent all of the state defendants in this matter. And if I may, I'd like to reserve two minutes for rebuttal. Your Honor, the District Court erred in this matter by entering a sweeping preliminary injunction barring any enforcement of 21A MRS Section 1064, a law that was approved by an overwhelming percentage of Maine voters at the ballot box based on their well-founded concerns about foreign government influence in recent Maine elections. There are a number of issues in this case. I'd like to focus on three. The first point is that the record evidence that Maine has here of a problem that needed to be addressed through legislation is very strong. And it distinguishes this case from other cases like, for example, the Minnesota case that the appellees cite. This is not a law that was dealing with an abstract or hypothetical problem, a problem that's happening somewhere else in the country. This was a problem that had recently happened in Maine. We had a referendum election in 2021 where there was massive election spending by entities in which foreign governments owned major stakes and entities that were wholly owned by foreign governments. The referendum was over a billion dollars. I'm familiar with the record. That's your first point. What's your second? Well, Your Honor, I wanted to address the 5% threshold. And the 5% threshold, because I think that's where the appellees train a lot of their fire in this case. And the 5% ownership threshold is narrowly tailored because it addresses three issues that the law is trying to address. First of all, there are cases in which a 5% owner, and there are many examples of this cited by us, cited by the amici, will be actively involved in the process of addressing this problem. But there are many that are not, right? Yes, certainly not in every case will a 5% owner be actively influenced. So I disaggregate Section 2 into three parts. A foreign government is speaking itself. A foreign government is directing, dictating, controlling, or participating. Correct. And those go to actual foreign speech in American campaigns, which is, I think you've tried to argue, is something we should be very concerned about as a compelling government interest. The second one, though, is only about, call it appearance, call it possibility. And I guess what troubles me is your briefs do a lot of effort to try to convince us it's possible that at 5% there'll be this, you know, there'll be this foreign speech problem. But not likely, not often, just possible. And I guess what concerns me is if we adopt possible as enough, there's a lot of American speech that's left at the table to protect just possibility. And that strikes me as a problem. I guess I have two responses to that. I think, first of all, I think in every case in which you have a block holder with a significant ownership stake in a corporation, there is going to be at least passive influence in that corporate management is going to be aware that they have a major investor that is a foreign government and is going to be thinking about how to make sure that they're appeasing those interests, that that block holder is aware of that. So there's passive influence even if it's not active. And the second issue with that is that it goes to our asserted compelling interest in avoiding the appearance of government, foreign government influence in  And that is the case regardless of whether it's a passive investor or an active investor, because the voters don't know. This all happens behind closed doors. There's no way for voters to know whether the government... Well, you think there is, because you enacted Part 3, where you somehow think there is a way to know. Well, there may be in some cases, Your Honor, certainly not in every case, but there are going to be cases where influence is a phone call. It happens, again, it happens behind closed doors. There's no way for the voters to know. And I think the fact, again, that this initiative was passed by 86% of the vote, historic margin, no initiative was ever passed by that much in Maine, shows that there is a huge concern by voters. Can we back up, though, to I think what Judge Afram's question was really getting at, which is the statute as it's drafted in terms of the 5%, why is it not over-inclusive? So in other words, what are we to make of the domestic owners who own the remaining 95% of these companies and may wish to have input into the political process? Well, sure, Your Honor. I mean, I think Citizens United talked about, you know, a corporation being an association of citizens. So in this case, you don't have quite that. You have an association of perhaps some citizens, perhaps some non-citizens, and then a foreign government. And I think the question of when you have an entity like this that is, you know, has this percentage of ownership that has the potential, not in every case, but has the potential to have pernicious influence on Maine elections, on U.S. elections, I think there's a compelling interest in treating an entity like that differently. And those 95%, you know, in sort of the worst-case scenario where there's not all the rest of the shareholders are U.S. citizens and it's 95%, they still have the ability to express themselves, just maybe not through this entity that, again, has this issue that makes it something other than an association of citizens. And yet those citizens don't control the association. So most associations, we can decide who's in and who's out. So I understand there's closely-held companies, but let's just talk about publicly-traded companies. I mean, you, the association, don't control. So today, I could be able to speak. Tomorrow, I, the company, can't, and that depends on the vagaries of the market. And that seems like an odd way to draw the lines. And so today we're at 4.8. Today we're at 5.2. We have to take our ads down. But tomorrow, the next day, we can put them back up. Well, Your Honor, I think in all campaign finance laws, there are issues of line drawing. That's sort of the nature of the beast to some extent. I mean, when you have a contribution limit, you have to decide the exact dollar amount that that's going to be. Right, but those don't change day-to-day. I mean, there's a problem about knowing whether you're covered by this law. It's one thing to say, I am a foreign government. It's another thing to say, we're doing something, we know what we're doing, and we know that the foreign person is sitting at our board meeting. Okay, but this other thing is just a moving target. And so you expect the company to be following the movement to know when it is and is not covered by the law. And so that strikes me as having a chilling problem, because the thing to do is to overcorrect, because there are criminal penalties associated with this, and just stay away from the line, and that's bad, because it removes speech, otherwise good speech, from the system. Well, Your Honor, I think what I was trying to get at before is even let's say we set the main threshold much higher, 50%, which is generally, I think everyone agrees that that's the standard for controlling, for having a controlling stake in a corporation, you'd still have that problem that you'd have to, there could be fluctuations and you'd have to determine that. But Citizens United itself, in sort of a passing comment, suggested that that would be a way that foreign government influence could be regulated. Presumably, though, I mean, I don't think this is in the record, but you'd have that problem less often, right? It has to be more frequent that ownership fluctuates between 4.8% and 5.2% to between 49% and 51%. And I guess it boils down to is the statute narrowly tailored on that 5% issue? Yes, Your Honor. I think you're probably right that it would happen more frequently around 5% than 50%. Because I think once you get up into those numbers, it's more likely that you're going to have a 100% owned foreign company, which we have several of that have been involved in recent elections in Maine. But I think it is narrowly tailored at 5%. And the reason for that, again, is because there is this, that is a, especially in a publicly traded corporation, that can be billions of dollars in interest that the foreign government owns. And that gives the foreign government the ability to influence corporate affairs, again, either actively or just passively through the fact that if corporate management realizes that they have to appease what's going to be one of their largest shareholders in their decision making. Your brief says, I'm sorry, I'm missing the page, but that the act might be unconstitutional in some applications, but has, quote, a wide swath of constitutional applications. Could you be more specific about any applications of the act that you are conceding are unconstitutional? So, Your Honor, just to be clear, I think that might have been an inelegant turn of phrase. We were not conceding any unconstitutional applications. And I did notice that when I was preparing for this. And what we were trying to say, Your Honor, is that in the event that the court determines that there are some unconstitutional applications, and obviously the one that we're all, the most heat and light is on is the 5% threshold. And should the court have concerns about that, our point is that there are many, many constitutional applications in the statute, even if this court is not persuaded, as the district court wasn't, that the 5% threshold is narrowly tailored. But to be clear, we do submit that the 5% threshold is narrowly tailored and is constitutional or likely constitutional, and the court erred in concluding otherwise. What about the indirectly participates language? Well, Your Honor, that comes from a federal regulation that has never been challenged, or at least never been successfully challenged, to my knowledge. And we define that in the Commission's rules. And it simply means that if you're directly participating, you have a representative of the foreign government or foreign government-controlled entity in the room in the decision-making process. Indirectly participating means that there's an intermediary that's acting on behalf of the foreign government or foreign government-controlled entity. Can I ask you a question about the 5% before we leave that? And just tell me what the statute covers, because I don't remember. If you have 13 foreign government entities that own 4%, is that a problem? That is not a problem under the 5% prong. One foreign government has to own more than 5%. And the appellees had suggested there might be vagueness in the law as to that. Our argument is that it is quite clear. It says a foreign government is the phrase used in the statute, and there's no ambiguity. And even if there were, the Commission's newly adopted rules make clear that it has to be a single foreign government. So you could have foreign government ownership 52% spread among 13. Not a problem. Under that section. As long as there was no participation by those foreign governments in the decision-making around election spending, yes, there are. And I think that that is still narrowly tailored, and the reason for that is because you still don't have a dominant block holder in that situation that is over the 5% threshold that can sort of call the shots. And there's no reason to think that if you have 13 foreign governments that all their interests are going to be aligned and they're all going to want the same thing and they're all going to be acting in concert. In fact, probably the more likely inference is that they all have their own different national interests that are not all aligned. And yet the problem with the statute is in some sense everyone's likely to be aligned, because the corporation has the goal of maximizing its profits, and the foreign entity and the Americans are just like it seemed like they were in fighting the pine tree initiative. It seems like that was to protect the company. And that seems like the usual situation, or at least often the situation. And so you have aligned interests, and we're saying, sorry, 95% of Americans, you can't express your aligned interests. It's no different from this foreign government, because they own 5%. That still seems troubling. May I respond, Your Honor? I think one issue there is that domestic shareholders might have other considerations beyond just maximizing profits that they might wish to express. But a foreign government, their interests are different because they have no stake in the American political community. They have no stake in the best interests of Maine people. Their interests are completely separate, and they are, as everyone expects, pursuing their national interests and not the interests of Maine or the United States. Before you sit down, can you, the definition of foreign... Oh, he won't be sitting down for a while. Before... Do you know the origin in this statute of the definition of foreign government? Where does that come from? I don't know. This is, again, a citizen initiative. So I'm troubled by that section, and I don't know if it's been precisely argued this way. But the definition of foreign government is actually the linchpin to the whole statute, because everything hinges on 50% ownership. All these things go back to foreign government. And when I read that definition, I, and I don't even know if the Secretary of State of the United States, would know who is covered by foreign government when we're talking about a de facto group that might have control over one part of one country, including insurgents. So somehow a company is supposed to figure out who are these foreign governments, because it's not the definition I would have said when you just said to me foreign government. It's this very nuanced, shifting thing. Is it Hezbollah? Is it... I mean, right, it's these kind of entities could be governments. And now I'm a CEO of a company, an American company. I have no idea who owns my company, because I don't, you know, this is always moving. And so I am not going to participate in political speech on behalf of the company, because this is vague. I might go to jail. And that's a chilling effect, because as Baladi says, we're interested in what companies have to say. And the company has no idea what's covered and what isn't. What is your response to that? Well, you're right. You're right that this wasn't raised by the appellees. And I think that that's significant, because they are corporations that have, at least in one case, have a lot of different owners, and they have not expressed any concern that they won't be able to figure this out. I mean, I think the type of entity that's going to be investing billions of dollars in a corporation is probably going to be... Well, Hamas has a lot of money. Is it a foreign government? Yeah, I think we'd have to do a fact-specific analysis of that. I'm not sure I could answer that right here, but I think that could certainly be done. But that's the problem, right? Your Honor, I guess my ultimate response, Your Honor, is that would be a very interesting as-applied challenge. But I think in... But this is the First Amendment, and we're worried about vagueness and chilling, and those are key considerations. Vagueness here is a much more robust doctrine than in other areas of the law, because we're worried about chill. And this seems like a classic chill problem. I am the CEO. This has criminal penalties, right? It does. Yeah, if... There's a Santa requirement, but yes, it does. And so I could go to jail if I don't get this right, and Hamas is investing in my company, and I want to participate, and I have no contact with them, but they have a lot of money, and they buy stock. And now I want to decide whether I want to participate in this event, this campaign, and I have no idea whether they are a foreign government or not. So my choice is to stay out of it, because I don't want to go to jail. And isn't that exactly what we talk about in the First Amendment context when we worry about chill? Well, Your Honor, I think, first of all, that I think the Santa requirement is absolutely essential, because I think there is case law suggesting a Santa requirement mitigates if there is any vagueness problem, and here it has to be knowing. So you have to know that it's a foreign government that is providing, you know, that is an owner of your company in order for you to violate the criminal penalties here. And again, I think it's an unusual enough situation where you're going to have a group where it's unclear whether they're a foreign government, that it doesn't rise to the level of a facial challenge, where you have so many unconstitutional applications that it swamps the plain legitimate sweep of the statute. I have a couple of questions. I'll try to be brief, but there's a hypothetical discussed in the record involving a foreign entity sending an e-mail and thus participating in the decision-making process. You know what I'm referring to there. So tell us why that wouldn't run afoul of the statute here, and keeping in mind perhaps this, that I may not be convinced that the new regulations fix the statute. Well, Your Honor, I think it's hard to disaggregate them from the fact that we have the new regulations because those are legally binding on the Attorney General and on the Commission. But I think the way I would answer that is that the statute was plainly modeled on the federal regulations that have almost identical language, and I think certainly the intention of the Commission and I think what the Court could reasonably expect from the State of Maine is that we're going to interpret that provision consistently with the federal regulations, and the guidance provided under the federal regulations makes it clear that that is not the sort of thing that the federal regulations are concerned with. But at the end of the day, we can't apply it that way because our rules now say specifically that an unsolicited communication is not participation. So we're legally prohibited from interpreting it that way. Okay. I'm going to skip sort of backwards, I think. You cite Foley for your position that a lower level of scrutiny is warranted here, but I'm wondering if Foley does fully support your position in that that involved a law, I think, reserved to citizens, in that case the police. Should we stretch the analysis of the law here in terms of political speech by certain speakers? I'm just not sure that the connection. Yeah, I think Blumen talks a lot about Foley, and certainly in the view of Blumen, those were relevant cases to political speech. And I think, you know, it ultimately comes down to is it an integral part of democratic self-government, the laws that are at issue here. And who is a police officer was determined to be that in Foley, and so we would assert that the... But there's no loss of First Amendment rights of American citizens in Foley. Yeah, I think it's a due process case, but there certainly is, you know... But you have a hybrid group of people, right, a conglomeration of people, some American, some not. And your premise is the non-Americans have to stay out. And because it's a conglomeration, there are some people in that mix who have lost what right they would otherwise have to speak through this collective organization. And so Foley is just about, can a non-American be a police officer? But there's no other harm on a group of Americans who want to exercise a fundamental constitutional right. So it doesn't seem like it's the same situation. And Blumen also is about, can this individual foreigner participate in an American political campaign? But there's no harm to the Americans, and that's what makes this case interesting and different, right? I agree with you, Your Honor. I think, you know, Blumen actually drops a footnote at the end where they say, you know, this also applies to foreign corporations. We don't have to decide in this case, you know, what makes a corporation a foreign corporation. I think that's where we are. That's why we're here today, is now we have to decide that. I guess what I would say is that, you know, Citizens United, again, in that sort of quip about predominantly owned corporations, predominantly owned by foreign investors, that is also a situation in which presumably you would have, you know, U.S. citizens that would be limited in their ability to speak because of the compelling government interests. So that could be strict scrutiny, appearance of foreign participation, and when it's predominantly owned, you meet the standard. But that's not, like, Foley is a rational basis case. And I guess I find it hard to think the standard of review for this statute should be rational basis. It could be. And we've suggested closely drawn scrutiny would be the better course here. I mean, I think given the complexities that Your Honor has just introduced that it's closely drawn is probably a better approach to the extent where, you know, we're blazing new trails here. And for that very reason, because these are entities that exist in this sort of limbo where they're not fully American, not fully foreign either. So that would be our suggestion that closely drawn makes the most sense, an intermediate level of scrutiny. And briefly, is there any main law that you can direct us to in analyzing whether the district court abused its discretion in reserving and not analyzing severability? Well, I think that the main law issue is 1 MRS section 71 sub 8, which is Maine's severability statute, which makes very clear that Maine has a very strong presumption in favor of severability. And it does on its face, and I don't have a case where this is, or a court has done this, but on its face it says that courts are supposed to sever unconstitutional applications and not just unconstitutional language from the statute. I don't think it says that it must be analyzed at the preliminary injunction. No, it doesn't at the preliminary injunction phase, Your Honor. But our view is that that's an abuse of discretion simply because there are provisions of the statute that are constitutional, and Maine has a very strong interest in allowing those portions to go into effect even if this court has reservations about certain discrete portions that can easily be severed out of the act. I just have a couple of questions. I'm going to ask you to be brief in your response just in the interest of time, but I understand, about another part of the First Amendment. So section 7, can you talk both in terms of vagueness and burden, but I'm particularly interested in burden, even though I think both are an issue. With respect in particular to other statutes that impose this kind of obligation to do due diligence on the media, and I'd also like you, the second part, to just tell me what you think about with respect to severability of that provision, should we determine that it should not stand. Sure, Your Honor. I think the commission is very sensitive to imposing burdens on domestic media companies, and that's why, and this is not just in the rule, but this was also in the affidavit that was put into the record by the executive director of the commission, that as the commission interprets the statute, the burden on media is extremely low. It basically allows the media to simply ask their advertisers if they meet the definition, and if the advertisers check a box that says we are not foreign government influence entities, that is sufficient. That is all they have to do to comply with the statute, unless they have actual knowledge that the representation is false. And that still serves the interests of the government under the statute, because if a foreign government influence entity makes a false representation on that check box, that becomes evidence of scienter that can be used to prosecute that entity potentially. So it's a very, very minimal burden, and there is no need for any investigations to happen, for any lawyers to be hired, any of the sort of thing that might raise those kinds of First Amendment concerns by imposing significant burdens on the media. And do you have examples of other statutes in Maine or elsewhere that impose those kind of obligations on the media? There is another statute within the campaign finance laws in Maine, I believe it's for independent expenditures, and I'm hoping I can recall this correctly. There is another statute within the campaign finance laws that prohibits what the media can publish. In your view on severability with respect to Section 7? I think that in this case it's clear that any of these provisions, to the extent that it's sort of practicable to sever, should be severed, because Maine people clearly want as much of this law to go into effect as possible. I think just based on the overwhelming vote in favor of this, Maine people would certainly take half a loaf over no loaf. So if Section 7 were the problem with this law and it was otherwise constitutional, absolutely, we think that's severable. Thank you. Thank you. Thank you. Thank you, Counsel. Counsel, at this time would Counsel for Appley Central Maine Power Company introduce himself on the record? He has a five-minute response. And we'll be a little flexible regarding time. I appreciate that, Your Honor. And Joshua Dunlap on behalf of Central Maine Power Company, and may it please the Court. The central issue in the case is this. Can the government silence U.S. citizens, U.S. companies like CMP, from speaking simply because a foreign public pension fund owns 5% of the company? The answer to that question is no. I want to touch first and quickly on the record evidence because it's an important point. And the record evidence here that the state relies upon to silence my client is this. It is a record of a U.S. company expending funds to defend itself against a referenda that would have seized its property. That is the evidence that the state uses to then attempt to silence that U.S. company in the case of future referenda. I want to focus, though, most of all on the 5% threshold. And that is simply before you do that so that I know we're only focused on that. Do you agree that the foreign government and the direct controls and dictates are okay? We do not challenge the direct dictator control. We do challenge the director and direct participation language. Just the participation part? The participation language. And you don't challenge, A, it is a foreign government part? We have not brought a challenge. This is a preliminary injunction. We have not raised that argument on the preliminary injunction mechanism. Okay. The 5% threshold is not narrowly tailored, and I can illustrate what a narrowly tailored law would look like. And that is clearly illustrated by the FEC Advisory Opinion 2006-15, which makes it clear that a U.S. company under federal law can continue spending money in campaigns, even if they're a subsidiary of a foreign company, if the spending is directed by U.S. citizens and if the funds are derived from U.S. operations. That's what a narrowly tailored law would look like. That's not what this law does. Instead, it sweeps in all companies that happen to have a 5% investment by a foreign entity, and simply because it's been a good corporate actor, it has thus drawn overseas investments. The state asserts that the mere possibility of influence by a 5% threshold, 5% owner, is the standard by which U.S. companies can be deprived of their First Amendment rights. That is not the right standard. Rather, Citizens United makes it clear that a company must be funded predominantly by a foreign entity before the company can be deprived of its First Amendment rights. And as we argue in our brief, and as helpfully illustrated as well in the main chamber's brief, that funded predominantly standard is a standard of control, not mere influence, and certainly not mere speculation of the possibility of influence. So Blumen says, I think, that its holding applies to foreign corporations. At what point would a corporation be considered a foreign corporation for purposes of the First Amendment analysis? I think you have to look to an issue of control, and Delaware law is pretty useful on this point. Delaware law makes it very clear that mere ownership thresholds, that's not all that goes into a control calculation. Rather, what you need to look at is also other indicia of control, such as voting rights, ability to appoint directors, board members, other indicia of control like that, might allow you to make the determination that a U.S. company is controlled by a foreign entity. But that's not what this law does. It uses a very blunt instrument, a 5% threshold, ownership alone, none of these other factors, and then sets that ownership threshold at such a low threshold that it sweeps in untold U.S. companies. In your brief, you sort of spend quite a bit of time talking about U.S. companies with minority shareholders, but Verson is almost entirely owned, I think, by the city of Calgary, even if indirectly. Does your argument fail if we apply it to Verson? I'll allow counsel for Verson to address their clients since they're here and will be speaking for themselves. Our point, though, is what I just articulated, which is the law to be narrowly tailored ought to be looking at whether or not there is control. There may be instances in which a 50% plus one ownership is not control if, for instance, there are non-voting shareholders, so the stock is a non-voting stock. So you accept, though, that there's an appearance rationale because not every – there won't necessarily be – I mean, there might be initiative control, but in fact, like the Calgary situation, they're not involved, and they're going to let the Americans decide, but the political decisions. We're just going to divest ourselves of those decisions. And so the only problem would be not actual but just the appearance because they have so much on paper control. We do not accept that mere appearance alone is enough because that is unbounded. Really, it is another – Then why do you get into all this instead of just saying one, the first part of the statute, and the third part up to participation is all that can be done? Why do you get into the rest of this? Our argument is that you need to show control, and if there's no control, Is control equivalent to political decision-making, or are those not necessarily the same thing? The control of the company is – it may be different from control of the political decision-making if there are walls, for instance, erected within the company to ensure that a foreign government does not participate in the company's decision-making. But yet you think that we could still just – they could have a statute that just deals with control, not actual direction control, or whatever the other word is, dictate. We have – correct. We have not challenged if there is control of a company that that could be regulated. But the law, again, here does far more than that by reaching companies as low as 5 percent. I would also just want to respond to a couple of points, and I don't want to presume upon the court's time. But also, counsel referred a couple of times to a passing comment or a quip in Citizens United. That was actually a holding of the court, not a passing statement. It determined that a law is overbroad if it regulates U.S. corporations that are not funded predominantly by a foreign entity. Could you address quickly this issue of regulations and new regulations and whether they constrain what may be broad language within the statute and how we should look at that? Well, clearly the state has been shape-shifting here because they have an overbroad statute and they proposed regulations that the district court found were unlawful, and they've now proposed additional regulations to try to fix that. We suggest that those are still not enough because they do not reflect the standard that, for instance, the FEC has adopted and that I referenced earlier. That would make it clear that U.S. companies who make their own decisions about political spending are not covered by the statute. Instead, they suggest that, you know, for instance, an example might be this. If a U.S. company is in a joint venture with a foreign-owned company and they have discussions about a response to a hostile referenda, would that immediately make the U.S. company a FGIE for purposes of the statute? Even though the U.S. company ultimately made its own determinations, went back to the boardroom, talked about it, and decided what they would do as U.S. citizens directing a U.S. company. So the regulations remain overbroad. They have not fixed the problem. What is your reaction to my suggestion that the definition of foreign government is vague? There are many vagueness issues in this statute, Your Honor. That is one of them. We've certainly raised others around the aggregation issue, the direct participation issue. And if I may, on that aggregation point, I think Your Honor touched precisely on a major problem with the statute in that if the purported reason for the statute is to eliminate the interference by foreign governments, the statute doesn't do that. If, for instance, Russia owns 4.9 percent, Belarus owns 4.5 percent, and Venezuela owns 4.5 percent of a U.S. company, that company would not be regulated. However, a company that happens to have a passive investment by the Norwegian Central Bank would be regulated if they happen to have 5.1 percent. This law is simply not tailored. And you criticize the directly or indirectly participates, and I just want to make sure I understand why. So you don't dispute direct, dictate, or control because that aligns with your argument that if the foreign government is dictating, directing, or controlling, that's not enough. But participation, is that because that's a vague term, we don't know what participation is, or participation is just a lesser form of influence that shouldn't concern us because they're not directing, dictating, or controlling? Both, Your Honor. It's unclear as to what it is. It's a lower standard than we believe should apply. And certainly the way that the regulations have construed the statute, it is overbroad for the reasons that we were just discussing around the example that I provided. Unless the Court has any further questions. Thank you very much. Thank you, Counsel. At this time, would Counsel for the Appellee's Versant Power please introduce himself on the record? Good morning, Your Honors, and may it please the Court. Paul MacDonald for Appellee's Versant Power and Enmax Corporation. We believe that the District Court acted within its discretion in finding that the Act, under discussion today, is facially invalid under the First Amendment. But the Court also found that the Act is preempted to the extent that it seeks to regulate federal candidate elections. There's been no discussion about the preemption issue this morning. The Court seems singularly focused on First Amendment. If you would like me to just stick with the First Amendment discussion, I'll do there, but I have some things that I could and would like to say about the preemption issue. Please. Okay, thank you. So, as the Court is aware, the federal campaign elections statute, Federal Election Campaign Statute, FECA, we call it, has an express preemption provision that's found in Section 3143. And it's very clear that the Act preempts any state law with respect to elections for federal office. There is Federal Election Commission guidance on that, which is found at 11 CFR Section 108, which essentially reasserts the federal preemption with respect to federal candidate elections. Now, FECA directly addresses the question of foreign participation in candidate elections. And it makes it unlawful for any foreign national to directly or indirectly make a contribution or an expenditure in connection with any federal, state, or local election. Focusing on the federal campaign elections here, we have a statute, the Act at 1604 Section 2. Can I interrupt you? I understood the state is agreeing that the Act doesn't apply to foreign spending in elections for federal offices. Am I wrong on that? That is the position that they are taking, Your Honor. But we would say that that is not enough. Essentially, the limiting construction that they are attempting to put on that provision of the Act is not appropriate for several reasons. The Act is clear that it applies to the nomination. So you want us to reach the preemption issue and to expand upon it. I want you to reach the preemption issue. I want you to affirm the district court. What work does that do? So when I'm thinking about whether this injunction be approved, so she says it's preempted. They just say it doesn't apply on its text. Okay. What does that do to the core of this, which as I understand it is Maine says that's fine. We're not applying it to the federal elections. What matters here is that that doesn't set what we can do here in Maine, and we want to do more than they do under the federal law here in Maine about our own local and referendum elections. I didn't really understand where it gets me in thinking about what's really important. Where it gets us is this is one commission at one point in time saying that it will not enforce this Act on a go-forward basis. The state does not have the authority in the criminal context to override the terms of the statute. So we would say that the statute clearly impinges upon the federal preemption. Okay. So it's important to you to say as a court that this doesn't apply to federal elections. Yes, and it's important for another overarching reason, which is that it's another reason why the Act is unconstitutional. It's another way in which the Act. But it's merely one part of the Act. Pardon me? It's only one part of the Act. It is one part of the Act. Yes, it is. Yes, that's absolutely right. But you don't take the position the rest of it is preempted. No. Well, we took the position below that the entire Act was both expressly and impliedly preempted. We were not able to convince Judge Thorsen that there was implied preemption. We're not challenging that finding on appeal.  I'm going to jump forward. So you note that the stipulation that the city of Calgary has, the city of Calgary cannot participate in the management of Enmax or of Versant. But could Calgary sell Enmax or direct Enmax to sell all of its shares in Versant? And if so, I think the answer to that might be yes, why wouldn't that sort of threat qualify as foreign government influence? Speaking in the as-applied context, may I continue? The reason that that wouldn't be a problem if Versant was sold is because the very purpose behind the ring-fencing around Calgary's influence over the decision-making of Versant derives from the authority of the Maine Public Utilities Commission to require local control over local utilities. So as a prerequisite to the foreign government-owned corporation's acquisition of Versant's predecessor, there was a requirement that there be sufficient ring-fencing to keep the foreign government's influence out of the state of Maine. So I would imagine it is highly likely, if not a certainty, that if Versant were going to be sold to another entity that had foreign government ownership, that the same regulations would apply and require that ring-fencing procedures be put in place that would prevent the foreign government from having any influence over the decision-making of the company. Thank you. No further questions? No further questions. Thank you, Counsel. At this time, would Counsel for Appalachian Pringle et al. please introduce himself on the record to begin? May it please the Court. Tim Woodcock for five Maine voters known collectively as the Maine electors. Your Honor, the Maine electors challenging this statute on the grounds that this statute threatens their ability to discharge their duties exercising the sovereign power of the state of Maine to make laws by denying them access to information that falls within the confines of Section 1064.2. And with that respect, Your Honor, to the Court, I would say... But what if there's a compelling interest for them not to have that information to act as voters? I mean, that seems to... It seems to... What you're saying begs the question, right? The question is... Your argument seems to be at a high level. The electors have a right to information. And there's some First Amendment, Virginia, Board of Pharmacy, and other cases that support that idea. But the difference seems to be is that if we accept Blumen and think Blumen applies to this, which are ifs, but if they did, then your voters wouldn't be entitled to that information because it's outside the scope of information they should have to be voters. Well, Blumen doesn't govern this aspect of their case, Your Honor, respectfully, because Blumen expressly said that it doesn't apply to issue advocacy or to lobbying. And this, although we have several aspects to our complaint here, and I would say that we adopt the First Amendment arguments of all the co-appellees here as well as the due process arguments, but we are particularly presenting here the right to petition. And so in this case, Blumen said it was not addressing issue advocacy or lobbying, and lobbying is another form of petitioning. So thinking in terms of Section 1064.2, 1064.2 is an extraordinarily broad part of the statute. It essentially applies to all forms of expenditures, all forms of contributions, which have the purpose of trying to influence either the initiation of one of the five types of referenda that are listed or the approval of any of the five types of referenda that are listed. And it provides serious criminal sanctions for people who violate the provisions of Section 1064.2. And I think it's very important to understand, at first I'd make this basic point from Citizens United, that the court observed in that case that civic discourse belongs to the people. And the government may not prescribe the means used to conduct it. And we are talking about civic discourse here, because the concept behind petitions is influence. Citizens United recognize that influence is essentially a function of our entire political process. Without, if you have, if you didn't have the capacity to influence, you wouldn't have a representative government. So the fact that people come to the electors in the course of a referendum campaign means that they are acknowledging the electors have the power to decide to make the law, and every law that they pass has the full force of law and applies to everybody, irrespective of whether a citizen or not a citizen, as long as they're within the jurisdiction of Maine. So the electors' position is that the government cannot tell them where they can get their information. And if they want to get their information from a particular source, they should be able to get it from that source without risk of criminal penalty. And I used as an example, which I think the government didn't quite get right in their response, the idea of the legislature's... Federal law doesn't support that. Isn't that what I just heard? There's a federal law that prevents foreign nationals from spending on campaigns, because self-American democracy is supposed to be run by Americans. And so do you disagree with that premise? Excuse me, I didn't mean to interrupt you, Your Honor. No, I think you're characterizing the Blumen decision, and Blumen essentially said, we're not deciding whether that applies to issue advocacy or lobbying. And that's really what we're talking about here. We are talking about, I would put it this way, Your Honor. When there is an initiative before the people, and it may come from a variety of sources, it could be a constitutional amendment, it could be a bond issue, it could be an indirect initiative, it could be, of which we've had several and which are really sort of on trial here in a sense, as well as the people's veto or conditional legislation coming out of the legislature. Any one of those things, when you are appealing to the people, try to get your message across, you are in effect lobbying. I mean, that is what they're doing. They are trying to persuade the people of their position. So your view is referenda is lobbying and lobbying is outside of Blumen? Well, Blumen says it's outside of Blumen. But referenda, which is the thing that we were talking about, right? That's not a federal thing, that's a state thing. Maine has it. And your point is referenda should be treated differently than political campaigns for candidates because referenda are a form of lobbying or ideas and it doesn't matter where the information comes from. That's part of it, Your Honor. The other part of it is that, if I may continue, that as was recognized in First National Bank versus Bilotti, these types of referenda do not involve quid pro quo corruption or even the appearance thereof. And I do think we do have a difficulty with the concept of foreign government influence as a concept, largely because coming out of Citizens United, in that case the court said reliance on generic favoritism or influence theory is at odds with standard First Amendment analysis because it is unbounded and susceptible to no limiting principle. It's not to say that foreign government influence may not be pernicious. The difficulty is that it's not inherently pernicious, whereas quid pro quo corruption is inherently pernicious. So we think that's not really a workable standard, at least as a basis to deny the electors the ability to get information, whatever source they choose. Thank you very much. Jonathan Bolton, Assistant Attorney General for the State Defendants. Just starting with the last issue we heard, I strongly disagree with the idea that referendums are entitled to, that the government interest is lesser in referendums. I would actually reverse it. If anything, the Maine has a stronger interest in policing government influence in our referendum elections, because that is the most core act of democratic self-government you could imagine, which is deciding what laws are going to be governed. And in that situation, if anything, the government interest is even stronger in making sure that it's people within our domestic political community and not foreign governments that are having a discussion about how we're going to be governed at a very fundamental level. One of my friends referenced untold U.S. companies that are potentially subject to the 5% ownership threshold. Well, the record only shows, we're only aware of two in the record. There is the CMP and its affiliated companies, and we have one other company that was mentioned by one of the appellees that are between the 5% and the 50% where it would be controlling. So one of the big issues in this case is whether this law is facially unconstitutional, which again requires looking at the number of potentially unconstitutional applications versus the number of constitutional applications. And I think that's troubling that you're seeing them to be sort of, I mean, there's clearly something going on in Maine around this pine tree initiative and people are unhappy, and now we've come up with this referendum to target, it seems like, one company that was involved when you're telling me this really doesn't have much application beyond these people who are trying to protect one thing. Well, I think, Your Honor, the record shows that the act was actually spurred mostly by the fact that there was a 100% foreign government-owned company in Maine. A company that was stood to profit from this infrastructure project in Maine that spent $22 million in our election, which was an unprecedented sum of money. And I think the record shows that that was the impetus, but that doesn't make it improper, unconstitutional in any way. That just created the problem or made people aware of the problem. And that's Hydro-Quebec defending from outside the United States? How did it do that? They had a U.S. subsidiary that they established in the United States, but it's a 100% owned subsidiary of Hydro-Quebec, which is an agent of the government, of course. That would be captured by Section 1, Subsection 1 of Section 2, or A of Section 2? That would be under the 5% threshold. That would not be a foreign government? No, because the spending was through the... Well, we don't know. It depends on how the money made to HQUS and who was involved. I think it would probably be under the 5% ownership threshold. It's a 100% ownership threshold, or ownership in this case, but it would be under the 5%. That's what we know for sure, anyway. Oh, I have more time. No, I don't have more time. Thank you, Your Honor.